

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-24-1996

# Dayhoff Inc v. HJ Heinz Co

Precedential or Non-Precedential:

Docket 95-3404,96-3250

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Dayhoff Inc v. HJ Heinz Co" (1996). *1996 Decisions*. Paper 158.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/158

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

`

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 95-3404 and 96-3250


DAYHOFF INC.,
a California corporation;

Appellant

v.

H.J. HEINZ CO., a Pennsylvania corporation;
HEINZ ITALIA S.p.A., an Italian corporation;
HEINZ DOLCIARIA S.p.A., formerly known as
SPERLARI S.p.A., an Italian corporation;
SPERLARI s.r.l., an Italian corporation;
and HERSHEY FOODS CORPORATION,
a Delaware corporation.


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 93-cv-01794)


Argued May 10, 1996

BEFORE:  GREENBERG, ALITO, and MCKEE, Circuit Judges

(Filed:        1996)

William B. Mallin (argued)
Mary K. Austin
Joseph M. Ramirez
Eckert, Seamans, Cherin &
Mellott
42nd Floor, 600 Grant Street

Pittsburgh, PA  15219

Attorneys for Appellant

Thomas L. Allen (argued)
Carla L. Campbell
Reed, Smith, Shaw, & McClay
435 Sixth Avenue
Pittsburgh, PA  15219

Attorneys for Appellees

OPINION OF THE COURT


GREENBERG, Circuit Judge.

## I.   INTRODUCTION

Appellant Dayhoff, Inc. initiated this diversity of citizenship action on October 29, 1993, alleging breach of contract, tortious interference with contract, fraud, and civil conspiracy against various of the appellees.  The action arose out of the termination of three contracts between Dayhoff and appellee Heinz Dolciaria S.p.A. involving the manufacture and sale of candies in the United States.  The terminations followed the sale of the Heinz Dolciaria candy business to appellee Hershey Foods Corporation.  The district court dismissed Dayhoff's claims related to two of the contracts because of arbitration and forum selection clauses, and dismissed all claims for lack of personal jurisdiction against appellee Heinz Italia S.p.A.  Heinz Italia is the parent corporation of Heinz Dolciaria and, in turn, is a subsidiary of appellee H.J. Heinz Co.  After additional discovery with respect to the third contract, the court granted appellees' motion for summary judgment on all remaining claims.  After Dayhoff appealed, the district court directed entry of a final judgment under Fed. R. Civ. P. 54(b), and Dayhoff then appealed again.  We have consolidated the appeals for disposition in this opinion.

Dayhoff is a California corporation with its principal place of business in California.  H.J. Heinz Co. is a Pennsylvania corporation with its principal place of business in Pennsylvania.  Hershey Foods Corporation is a Delaware corporation with its principal place of business in Pennsylvania. Appellees Heinz Italia S.p.A., Heinz Dolciaria S.p.A., and Sperlari s.r.l. are Italian corporations, with their principal places of business in Italy.  As the monetary threshold for diversity jurisdiction was met, the district court had jurisdiction under 28 U.S.C.  1332.  We have jurisdiction under 28 U.S.C.  1291.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY
### A.   FACTUAL BACKGROUND
#### 1.   The License Agreement

Dayhoff Australia Pty, Ltd., and Sperlari S.p.A. entered into a License Agreement on October 19, 1989, pursuant to which Sperlari S.p.A. granted Dayhoff Australia the exclusive license to make and sell Frutteto candy in the United States as of June 1990.  Dayhoff Australia has assigned its rights and obligations under the agreement to Dayhoff.  The ten-year term of the License Agreement expires October 19, 1999, but the agreement permits Dayhoff to continue thereafter to manufacture and market

Frutteto candy in the United States under a non-exclusive, royalty-free license.  Article 21 of the agreement provides that Italian law will govern its interpretation and Article 22 provides that any disputes relating to it will be adjudicated in an arbitration proceeding in Italy:

> 22.  ARBITRATION
> All controversies arising from the present contract or relating to the same will be definitively settled according to the Reconciliation and Arbitration Rules of the International Chamber of Commerce, excluding recourse to the common law courts, by one or more arbitrators appointed in accordance with these Rules.
>
> The arbitration tribunal will decide on its competence to decide the matter and on the validity of the arbitration clause.
>
> Each party can apply to the relevant Law Courts to confirm the arbitration sentence or enforce execution of the same. Arbitration proceedings will take place in Milan.

App. at 46.

2.  The Frutteto Distribution Agreement

On July 26, 1990, Dayhoff and Sperlari S.p.A. signed the Frutteto Distribution Agreement, which provides that Dayhoff will be the exclusive United States distributor of Frutteto candy.  The contract does not have a set term, but, like the License Agreement, contains a governing law clause:

> B.  GOVERNING LAW
> This Agreement shall be governed and constructed in accordance with the laws of Italy and the parties hereto irrevocably submit to the exclusive jurisdiction of the Court of Cremona (Italy).

App. at 49.  In April 1992, Sperlari S.p.A. assigned its rights under the 1989 Frutteto Licensing Agreement and the 1990 Frutteto Distribution Agreement to Heinz Dolciaria.  App. at 198.

3.  The Bulk Candy Distribution Agreement

Dayhoff and Heinz Dolciaria executed the Bulk Candy Distribution Agreement on July 17, 1992.  Pursuant to this agreement, Dayhoff became Heinz Dolciaria's exclusive United States distributor of certain candies other than Frutteto candy. The Bulk Candy Distribution Agreement has an eight-year term that expires at the earliest on July 17, 2000.  The agreement provides that disputes arising from it are to be litigated in the United States District Court for the Western District of Pennsylvania and that the agreement will be construed in accordance with Pennsylvania law.  App. at 50-67.  Thus, the three agreements provide for three different fora for adjudicating disputes and provide for the law of two countries to apply to their interpretation.  As we shall see, this fractured approach to

dispute resolution under related contracts has led to great expense and confusion and, we are afraid, will continue to do so.

Because some of Dayhoff's claims are based on events surrounding the negotiation of the 1992 Distribution Agreement, the facts relating to the negotiation of that agreement require further discussion. The district court rejected Dayhoff's claims related to this agreement on summary judgment; therefore, we will present the facts pertaining to these claims in the light most favorable to Dayhoff. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230-32 (3d Cir.), cert. denied, 114 S.Ct. 554 (1993); see also Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 978 (3d Cir. 1993).

The parties negotiated the Bulk Candy Distribution Agreement through numerous facsimiles between the United States and Italy. On June 4, 1992, Luigi Volta, then a long-time employee of Heinz Dolciaria and currently employed by Sperlari s.r.l., a successor corporation to Heinz Dolciaria, informed Dayhoff that "[t]his is our last and final proposition." Sealed app. at 1011-12. On June 8, 1992, Volta informed Dayhoff that an agreement was "reachable" and invited Uday Lele, president of Dayhoff, to come to Cremona, Italy, to "finalize" the agreement. Id. at 1013.

Shortly thereafter, Lele traveled to Cremona to sign the agreement. According to Dayhoff, Lele understood that the negotiations were virtually over and that the contract terms would follow the facsimiles. However, when he arrived in Italy to sign the contract, Lele learned that Antonella Giacobone, an attorney for Heinz Italia, would be at the meeting, as would Volta and Franco Seletti. Seletti, also a former employee of Heinz Dolciaria, now employed by Sperlari s.r.l., is above Volta in the corporate ladder.

Lele never had met or dealt with Giacobone, and there had never been an attorney present during previous negotiations between Dayhoff and Heinz Dolciaria or their predecessors, or at the execution of their previous contracts. Lele had not been given advance notice that Giacobone would be at the meeting, and no one had suggested that he might want to bring his own lawyer. Dayhoff alleges that when Lele asked Giacobone why she was present, she advised him that she would protect Dayhoff's interests as well as those of Heinz Dolciaria, and that she was Dayhoff's de facto attorney in connection with the negotiation of the contract.

At the meeting, Giacobone presented Lele with a draft of the Bulk Candy Distribution Agreement that he had not seen during the parties' previous negotiations. The draft contained a termination provision similar to section 14.3, the one ultimately incorporated into the final agreement. According to Dayhoff, Heinz Dolciaria had not discussed the termination provision with it previously. Thus, the provision had not been incorporated in the parties' prior drafts or agreements.

At his deposition, Lele testified that he inquired into the meaning of this provision at the meeting:

> I asked Antonella Giacobone what this
> meant, and she said, Mr. Lele, you are

> operating in the American market.  Heinz USA
> is one of the most well-known food companies,
> we don't want you to use the Heinz name to
> sell your company to somebody else and become
> a rich man and we get left holding the baby
> and having to deal with somebody we don't
> want to deal with.  That is what she told me.

Sealed app. at 743-44.  Dayhoff alleges that when Lele asked Giacobone specifically what the termination provision meant, she did not tell him that the appellees could invoke the clause when Heinz Italia rather than Dayhoff sold its business.  Instead, Dayhoff alleges, she advised him that the provision protected Heinz Dolciaria in the event that Dayhoff was sold or its assets assigned.  Moreover, Dayhoff alleges that in connection with Giacobone's explanation of the clause, she told Lele that "[s]he would be taking care of both our interests."  Br. at 9.  Dayhoff further claims that Volta confirmed Giacobone's representations as to the meaning of the termination clause by telling Lele that the provision was intended to protect Heinz Dolciaria in the event that Dayhoff sold or assigned its assets to another company.

Dayhoff thus asserts that no one informed Lele that the clause would entitle Heinz Dolciaria to terminate the contract without compensation in the event that Heinz Dolciaria underwent a change of control or sold its assets.  Indeed, Dayhoff claims that explanatory statements to Lele by Giacobone and Volta were inconsistent with such an interpretation.  Dayhoff states that Lele understood the agreement to mean that Heinz Dolciaria would not have the right to terminate the contract if Heinz Dolciaria sold or transferred its assets to another corporation.

Dayhoff claims that only after it initiated this litigation did the appellees assert that the termination clause entitled Heinz Dolciaria to terminate the contract without compensation when Heinz Italia sold the confectionery business.  Giacobone then testified that she had included the clause for this specific purpose.  At her deposition, Giacobone further claimed that she "intended to cover every possible . . . legal or financial way in which our [Heinz Italia's] confectionery business could be sold . . . ."  Sealed app. at 1032-33.  Dayhoff claims that Giacobone did not deny, however, that she failed to disclose this information when Lele specifically questioned the meaning of section 14.3.

### 4.  Performance of the Three Contracts

Dayhoff consistently performed its obligations under the three contracts and created a market for Heinz Dolciaria's candies in the United States.  Dayhoff claims to have invested more than $1.6 million in performing the contracts.  As proof of its satisfactory performance, Dayhoff asserts that as recently as September 30, 1993, Heinz Dolciaria asked Dayhoff to expand its operations to distribute additional Heinz Dolciaria candies.  Dayhoff expected enormous financial returns from its substantial investment.

### 5.  Termination of the Three Contracts

According to Dayhoff, as early as March 1993, H.J.

Heinz and Heinz Italia, without Dayhoff's knowledge, began negotiating the sale of Heinz Dolciaria's business to Hershey. Dayhoff alleges that when it learned about this impending transaction and inquired as to its effect on its contracts, Heinz Dolciaria assured it that there would be no effect and that there was no reason to terminate the contracts. Yet, according to Dayhoff, H.J. Heinz, Heinz Italia, and Hershey even then were searching for ways to terminate the contracts. On September 13, 1993, Giacobone sent a letter to Hershey discussing the contracts in detail with particular reference to the termination provisions. The letter indicated that Lele was "well known and appreciated" by Sperlari S.p.A.'s (i.e., Heinz Dolciaria's) sales managers. Sealed app. at 59-60.

On September 14, 1993, Heinz Italia sold virtually all of its confectionery business to Hershey Holding Company, a subsidiary of Hershey Foods Corporation, for $133,000,000. Heinz Italia accomplished the sale through the formation of a new company, Sperlari s.r.l.; the transfer of substantially all the assets and liabilities of the confectionery business to Sperlari s.r.l.; and the sale of Sperlari's stock to Hershey Holding Company. As a condition of that sale, Hershey insisted on termination of the Dayhoff contracts, and thus when Hershey purchased the confectionery business the Dayhoff contracts were not included. The closing memorandum of the sale shows that Hershey's purchase did not include the contracts, Heinz Italia agreed to terminate the Dayhoff contracts, and Heinz Italia agreed to indemnify Hershey from any liabilities arising from the termination of the contracts. Sealed app. at 940-41.

According to Dayhoff, Seletti deliberately decided to conceal the termination decision from it. Hence, Dayhoff claims that it was not informed of the termination and continued to devote itself exclusively to the promotion of the Sperlari name and products and continued to inform Seletti and Volta of its efforts. Dayhoff alleges that, even as Lele was invited to visit Milan to discuss the parties' continuing business relationship and the extension of the Bulk Candy Distribution Agreement to include additional candies, Seletti and Volta were providing Hershey with confidential information concerning Dayhoff's business.

By letter dated September 28, 1993, at Hershey's direction and insistence, Heinz Italia issued a letter terminating Heinz Dolciaria's three contracts with Dayhoff:

As you may have heard, we recently sold all our confectionery business to the Hershey Group. As a consequence, we hereby notify you [of] our decision to forthwith terminatethe [License Agreement, Frutteto Distribution Agreement, and Bulk Candy Distribution Agreement]. The Frutteto Distributorship and the Bulk Candies Distributorship are terminated also for your failure to attain respectively the Minimum Quantities and the Minimum Purchases.

Sealed app. at 950 (emphasis in original). Dayhoff notes that

Heinz Italia did not mention section 14.3 of the Bulk Candy Distribution Agreement in the September 28, 1993 termination letter.

Giacobone called Volta after she saw the September 28, 1993 termination letter to express her concern regarding Dayhoff's likely reaction. Volta assured Giacobone that there was no problem with terminating the Bulk Candy Distribution Agreement because of the contract's termination provision. On the other hand, Volta expressed concern that there was no justification for terminating the Frutteto Distribution Agreement. Dayhoff alleges that at that time Giacobone reassured Volta by reminding him of the contract clause providing for an Italian forum, and stating that Dayhoff might not be willing to pursue its rights in Italy. Sealed app. at 1101-04. Dayhoff reacted to the termination letter by informing Heinz Dolciaria that the purported terminations were invalid and had no effect because there were no grounds for the terminations and because Heinz Italia, which was not a party to the contracts, could not terminate them.

Since the termination, Hershey has announced to Dayhoff's customers that Hershey soon would begin selling candies in the United States where Dayhoff has exclusive United States rights. As a result, Dayhoff claims that its sales have declined dramatically and its standing in the United States candy market has been shattered.

## B. PROCEDURAL HISTORY

Dayhoff initiated this action on October 29, 1993. In its amended complaint, Dayhoff alleged claims against Heinz Dolciaria for breach of all three contracts. Dayhoff also asserted breach of contract claims against Sperlari s.r.l. on the ground that it took over Heinz Dolciaria's business when Heinz Dolciaria effectively was stripped of its assets. Dayhoff does not assert breach of contract claims against Hershey, H.J. Heinz, or Heinz Italia. Dayhoff, however, asserts claims for tortious interference with contract against all appellees except Heinz Dolciaria. Dayhoff asserts claims against all appellees for fraud and conspiracy, and seeks the imposition of a constructive trust on all proceeds from the sale of Heinz Italia's confectionery business and all proceeds from the manufacture and sale of Heinz Dolciaria or Sperlari s.r.l. candies in the United States. It also seeks restitution from Hershey, Sperlari s.r.l., and Heinz Dolciaria, and reformation of the change of control termination provision of the Bulk Candy Distribution Agreement. Dayhoff Australia originally was a plaintiff in the suit; however, Dayhoff Australia prior to the institution of the suit had transferred and assigned to Dayhoff its rights under the 1989 License Agreement. Thus, it was dropped as a plaintiff.

On March 14, 1994, the appellees made a joint motion to dismiss or for summary judgment. On October 3, 1994, the court, through Judge Ambrose, dismissed Dayhoff's claims relating to the License Agreement on the ground that the agreement compelled Dayhoff to arbitrate all claims arising from it against all appellees, including those who had not signed it. The district

court also dismissed all of Dayhoff's claims relating to the Frutteto Distribution Agreement on the ground that Dayhoff was compelled to litigate those claims in the courts of Cremona, Italy. Finally, the district court dismissed all claims against Heinz Italia for lack of personal jurisdiction. Thus, this initial disposition left outstanding only Dayhoff's claims under the Bulk Candy Distribution Agreement against the appellees other than Heinz Italia.

The case then was transferred to Judge Cindrich, who, on July 10, 1995, granted summary judgment in favor of the appellees on Dayhoff's remaining claims related to the Bulk Candy Distribution Agreement. Dayhoff then appealed. We are exercising plenary review.

We note that insofar as we are aware, notwithstanding the October 3, 1994 order, the parties have not instituted arbitration or litigation proceedings in Italy. Dayhoff claims that Hershey, Sperlari s.r.l., and H.J. Heinz did not consent to jurisdiction of the arbitration in Milan or litigation in the courts of Cremona until after the district court conditioned its dismissal of Dayhoff's claims on that consent. Dayhoff's consent neither was sought nor given.

## III. DISCUSSION
### A. THE 1989 AND 1990 AGREEMENTS

Dayhoff's initial argument is that the district court erred in dismissing its claims related to the 1989 and 1990 Frutteto agreements because, in Dayhoff's view, the arbitration and forum selection clauses of those agreements, on which the district court relied in reaching its result, do not apply to all of the appellees and, indeed, are not effective at all. Dayhoff bases its argument that the clauses are not effective as to all the appellees principally on our opinion in Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503 (3d Cir. 1994), which the Supreme Court affirmed in First Options of Chicago, Inc. v. Kaplan, 115 S.Ct. 1920 (1995).

Dayhoff asserts that the Supreme Court's opinion in Kaplan strongly emphasized that parties cannot be required to arbitrate a dispute unless they specifically and expressly have agreed to arbitration. It claims that the district court's holding that Dayhoff was required to arbitrate its claims with Hershey under the License Agreement because that was "reasonable," even though Hershey was not a party to the contract, was erroneous and inconsistent with Kaplan. Dayhoff further claims that in crafting its standard of reasonableness, the district court ignored the threshold issue of whether it is proper, as a matter of law, to compel Dayhoff to arbitrate its claims against Hershey, a stranger to the License Agreement, where Dayhoff has not agreed to arbitrate with Hershey. Dayhoff asserts that Kaplan unequivocally held that such compulsion is improper where, as here, there is no agreement to arbitrate between the relevant parties.

In Kaplan, the Supreme Court affirmed our decision directing the district court to vacate an arbitration award against a party who had not agreed to arbitrate. 115 S.Ct. at

1926.  Exercising de novo review, we held that the Kaplans could not be compelled to arbitrate claims made pursuant to various contracts because they individually had not signed the specific contract containing the arbitration clause, although they had signed related contracts.  Kaplan, 19 F.3d at 1516.

The Kaplans were not obligated to arbitrate because they had not agreed to do so.  As the Supreme Court wrote:

> [A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration.

115 S.Ct. at 1924 (citations omitted).  Further, the Court stated that:

> After all, the basic objective in this area is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts, 'are enforced according to their terms.'

Id. at 1925 (citations omitted).

Dayhoff claims that Kaplan is particularly significant because one of the individual defendants in that case, Manuel Kaplan, was the president, director, and the sole shareholder of the defendant corporation, which was obligated to arbitrate because Kaplan had signed a contract containing an arbitration clause on its behalf.  Nonetheless, Kaplan himself was not obligated to arbitrate the claims against him because he had not entered into an agreement to arbitrate individually, although he had signed related agreements.  Dayhoff points out that if reasonableness or a close relationship were sufficient cause to compel a non-party to arbitrate, Kaplan would have been a prime candidate for arbitration.  However, Dayhoff notes that we rejected any test for determining whether a party had to arbitrate other than a determination of what the contract's terms provided:

> Arbitration is fundamentally a creature of contract . . . 'arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.'

19 F.3d at 1512 (quoting AT & T Techs., Inc. v. Communications Workers, 475 U.S. 643, 648-49, 106 S.Ct. 1415, 1418 (1986)). Dayhoff argues that Kaplan thus discredits the theory that as long as an arbitration clause is applicable to the contracting parties, it is proper to bring into the arbitration all of the parties to the dispute even though they are not parties to the agreement, and thus have not agreed to arbitrate.  Accordingly, since Dayhoff and Hershey did not agree to arbitrate, Dayhoff asserts that it cannot be required to do so.

Further, Dayhoff notes that a year after it commenced this litigation, Hershey gave its consent to arbitration in Italy, but only after the district court had required such consent as a condition of dismissing the action against it.

Dayhoff claims that the very existence of this consent underscores its point that there is no legal basis for requiring either Hershey or Dayhoff to arbitrate in Italy, because the mere fact that Hershey cannot be compelled to do so demonstrates that Dayhoff should not be required to take its claims there either.

Dayhoff applies its arguments relating to the arbitration clause of the 1989 Licensing Agreement to the forum selection clause of the 1990 Frutteto Distribution Agreement, arguing that Kaplan would not countenance sending the parties to a foreign court, absent a valid agreement selecting that court. Dayhoff claims that the rationale of Kaplan thus governs the forum selection clause, and that Hershey's belated consent to the jurisdiction of the Italian courts is simply irrelevant, except that it shows that there was no agreement between Dayhoff and Hershey to resort to the Italian forum.

In response, appellees argue that the 1989 Licensing Agreement and the 1990 Frutteto Distribution Agreement contained, respectively, a valid arbitration clause and a valid forum selection clause. Appellees claim that the district court correctly relied on these clauses in dismissing Dayhoff's claims relating to these two agreements, and thereby acted consistently with precedent that upholds the enforceability of such clauses. Further, appellees argue that these clauses not only apply to breach of contract claims, but also to tort claims arising from contractual relations. Br. at 15. Appellees principally rely upon the decision of the Court of Appeals for the Ninth Circuit in Manetti–Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509 (9th Cir. 1988).

Manetti–Farrow involved claims arising from the termination of the North American distributor of Gucci Accessories. The distribution agreement between the North American distributor and a Gucci Italian affiliate (Gucci Parfums) included a forum selection clause requiring litigation of "any controversy regarding interpretation or fulfillment of the present contract" in Italy. Id. at 511. Following its termination, the North American distributor commenced litigation in the United States against Gucci Parfums, its Italian parent (Guccio Gucci), an American Gucci affiliate (Gucci America), and various employees and directors of the corporate defendants. The North American distributor asserted a variety of claims against these defendants, including tortious interference with contractual relations. Id.

The North American distributor argued that the forum selection clause should not apply to its tort claims, particularly those claims it was asserting against parties other than Gucci Parfums who were not parties to the forum selection clause. The district court rejected this argument, and the court of appeals affirmed. The court of appeals concluded first that the forum selection clause did apply to the tort claims asserted by the North American distributor, stating that "[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." Id. at 514. The court concluded that all of the North American distributor's claims required interpretation of

the contract and therefore fell within the scope of the forum selection clause.  The court further concluded that the forum selection clause applied to all defendants, even those who were not parties to the forum selection clause.  It reasoned that "the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants."  Id. at 514 n.5.

Relying upon the reasoning of the court of appeals in Manetti-Farrow, appellees argue that the district court correctly concluded that all of Dayhoff's claims relating to the 1989 and 1990 Frutteto agreements should be dismissed.  SeeDayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 9 (W.D. Pa. Oct. 3, 1994) ("Although Heinz, Heinz Italia, Sperlari s.r.l. and Hershey are not parties to the Agreements, their conduct is so closely related to the contractual relationship between Heinz Dolciaria and Dayhoff that we find that the forum selection clause applies to all Defendants.").  Appellees further rely on similar decisions of other courts.  See br. at 18 (citing Coastal Steel Corp. v. Tilghman Wheelabrator Ltd., 709 F.2d 190, 203 (3d Cir.) ("[T]he law of contracts . . . has long recognized that third-party beneficiary status does not permit the avoidance of contractual provisions otherwise enforceable."), cert. denied, 464 U.S. 938, 104 S.Ct. 349 (1983); Bonny v. Society of Lloyd's, 3 F.3d 156, 162 (7th Cir. 1993) (noncontracting defendants subject to forum selection clause because integrally related to contracting defendants such that suit should be kept in a single forum), cert. denied, 114 S.Ct. 1057 (1994); TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc., 915 F.2d 1351, 1354 (9th Cir. 1990) (forum selection clause can restrict third-party beneficiary to designated forum; it is not unreasonable or unjust to enforce clause when all other defendants agree to jurisdiction in the selected forum); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.")).

Appellees claim that neither the decision of the Supreme Court nor that of this court in Kaplan controls the result of this case.  Appellees assert that Kaplan involved different legal issues and different factual circumstances from those here.  First, appellees read the Supreme Court's opinion in Kaplan narrowly, claiming that the case solely addressed two questions relating to standards of review to be applied to district court decisions by courts of appeals.  More generally, however, appellees claim that the case did not present the issue before us.  In particular, appellees claim that:

> Mr. & Mrs. Kaplan did not agree to
> arbitration of any disputes involving their
> agreement with First Options.  Here, by
> contrast, Dayhoff explicitly agreed to
> adjudicate all claims relating to the 1989
> Frutteto License Agreement and the 1990
> Frutteto Distribution Agreement in Italy

under Italian law. Unlike Kaplan where the issue was whether Mr. & Mrs. Kaplan had agreed to arbitrate any claims, the issue here is the scope of the arbitration and forum selection clauses entered into by Dayhoff.

Br. at 21.

We agree with Dayhoff that the arbitration clause in the 1989 Licensing Agreement and the forum selection clause in the 1990 Distribution Agreement can be enforced only by the signatories to those agreements. The opinions in Kaplan are the controlling precedent and thus we decline to follow the reasoning of the Court of Appeals for the Ninth Circuit in Manetti-Farrow. Nor do we believe any of the other cases cited by appellees are persuasive here, as those cases all may be distinguished from that before us. We also point out that Heinz Italia and H.J. Heinz should not by reason of their corporate relationship with Heinz Dolciaria be able to invoke the arbitration and forum selection clauses, for there is no more reason to disregard the corporate structure with respect to such claims as there would be to disregard it with respect to other legal matters. If Heinz Italia and H.J. Heinz wanted to be able to invoke the arbitration and forum selection clauses, they should have directed Heinz Dolciaria to include appropriate language in the 1989 and 1990 agreements allowing them to do so.

Of course, we recognize that Dayhoff did agree to the arbitration and forum selection clauses, whereas in Kaplan the Kaplans had not agreed to any arbitration or forum selection clause. However, we find appellees' position unacceptable, in that under it Hershey (as well as the other non-signatories to the agreement) has the option to accept or reject the arbitration and forum selection clauses, while Dayhoff, under the district court's opinion, is compelled to accede to Hershey's wishes. The very fact that Hershey would have such a choice belies the existence of an agreement between Dayhoff and Hershey, an agreement that purportedly lies at the basis of appellees' argument. For this reason, we will reverse the decision of the district court to dismiss all of Dayhoff's claims related to the 1989 and 1990 Frutteto agreements against the non-signatories to those agreements, except for Sperlari, s.r.l., the successor to Heinz Dolciaria.

Dayhoff next urges us to hold that the arbitration clause in the License Agreement and the forum selection clause in the Frutteto Distribution Agreement should not be enforced in favor of even Heinz Dolciaria or Sperlari s.r.l. Dayhoff claims that such clauses will not be enforced where "`trial in the contractual forum will be so gravely difficult and inconvenient that [the party] will for all practical purposes be deprived of [its] day in court.'" Br. at 27 (quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18, 92 S.Ct. 1907, 1917 (1972)). Dayhoff asserts that appellees seek precisely that result: to prevent it from pursuing its rights and to evade all liability for their wrongful conduct. Br. at 27.

The district court addressed these claims in its

October 3, 1994 opinion.  In that court Dayhoff stated, interalia, that the enforcement of the forum selection clause would be unreasonable because Italian courts would have no authority to enforce preliminary or permanent injunctive relief in the United States, and that only in the United States courts could Dayhoff receive complete, consistent, and meaningful relief.  Dayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 6 (W.D. Pa. Oct. 3, 1994).  After carefully reviewing these arguments, the district court found that it is not unreasonable to enforce the forum selection clauses:

> The parties to the Agreements were sophisticated business people and there is no indication that Plaintiff was not aware, or could not have made itself aware, of the consequences that would result from including the forum selection clauses in the Agreements including whether the chosen forum was adequate and convenient.  Simply because Plaintiff is unhappy, in retrospect, about the forum it designated is insufficient to warrant a finding that the clauses are unenforceable.  It would be patently unfair to allow Plaintiff to avoid the mandates of the forum selection clauses due to inconvenience because we would merely be shifting the burden of inconvenience to the other party to the Agreement, an Italian corporation.  We also believe that factors which weigh heavily in favor of enforcing the forum selection clauses include the fact that the parties agreed that Italian law would govern the Agreements and that the Agreements are international in character and have, at most, a tenuous relationship to the Western District of Pennsylvania.

Id. at 7.

We agree with the district court's analysis of this issue, except that we think the agreements have more than a tenuous relationship to the Western District of Pensylvania, as the contracts contemplate performance in the United States.  But this narrow area of disagreement does not lead us to reject the district court's conclusions that the arbitration and forum selection clauses are enforceable.  Therefore, we will affirm its finding that Dayhoff must litigate any claim relating to the 1989 and 1990 Frutteto agreements according to the arbitration and the forum selection clauses of those agreements.  However, unlike the holding of the district court, our holding will apply only to Dayhoff's claims against Heinz Dolciaria (and its successor, Sperlari s.r.l.), because of our earlier holding that the clauses do not apply to non-signatories of the agreement.

In reaching our result on this point, we recognize that Dayhoff emphasizes it may have to litigate its claims in three different fora with three different sets of rules, and it asserts that it has "no reasonable expectation of being able to enforce

its rights even after it has secured favorable rulings." Br. at 28. We are not impressed by these arguments. While we agree with Dayhoff that it did not agree on arbitration and forum selection clauses with respect to all the appellees, it did agree to litigate with Sperlari S.p.A. and Heinz Dolciaria in three different fora. Furthermore, we do not see why, if it is successful in any forum, it could not enforce its rights, though enforcement might require ancillary litigation and the extension of comity to foreign judgments. Undoubtedly, the procedural problems facing Dayhoff are daunting but Dayhoff's bargaining when it entered into the three agreements is the cause of that.

## B. THE 1992 AGREEMENT

Dayhoff next asserts that the resolution of its claims regarding the unlawful termination of the Bulk Candy Distribution Agreement and the fraud that allegedly accompanied that termination centers on factual disputes, including credibility issues, and that the district court therefore should not have decided its claims relating to that agreement on a summary judgment motion. As presented by Dayhoff, the facts supporting its claim that the termination clause was included in the executed contract by fraud include the following. Heinz Dolciaria invited Lele to come to Italy for the final negotiations and execution of an agreement that he had been led to believe was essentially a "done deal." Upon his arrival, Lele was confronted with Giacobone, an attorney for Heinz Italia, who told him that she would be representing Dayhoff's interests as well as those of Heinz Dolciaria.

At this meeting, Lele saw the termination provision for the first time. Lele did not understand what it meant, and therefore asked Giacobone to clarify its meaning. She explained that it was there to protect Heinz Dolciaria in case Dayhoff underwent a change of control. Volta confirmed that meaning to Lele. Based upon this explanation, Dayhoff accepted the clause and devoted its energies to the exclusive distributorship provided by the contract. Giacobone subsequently testified that, contrary to what Lele claims she told him, she had put the provision in the contract so that Heinz Dolciaria could get out of the contract in the event that its business was sold. Moreover, Volta later took this position as to the meaning of the provision as well. This evidence, according to Dayhoff, supports the conclusion that there was "fraud in the execution of the contract, or at least a jury could so find after weighing the evidence and assessing credibility." Br. at 33.

In its July 10, 1995 opinion, the district court addressed these arguments in assessing the appellees' summary judgment motion regarding the 1992 agreement. The dispute revolves around section 14.3 of the agreement, the final termination clause executed by the parties, which states:

> Either party shall have the right to
> terminate this Agreement upon written notice
> to the other party in the event that the
> other party becomes bankrupt, insolvent, or
> goes into liquidation, or in the event that

> either party assigns the whole or any
> substantial part of its business or assets or
> merges with another company or undergoes a
> change of control.

See Dayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 7 (W.D. Pa. July 10, 1995). The appellees have contended that this provision is straightforward and directly applicable to the situation here involved. Since a transfer of assets took place from Heinz Dolciaria to Sperlari s.r.l., whose stock Hershey acquired on September 14, 1993, appellees argue that the conditions triggering the application of section 14.3 were satisfied; that Heinz Italia's September 28, 1993 letter effectively terminated the three agreements with Dayhoff; and that all Dayhoff's claims relating to termination of the 1992 Agreement therefore are foreclosed. In response, Dayhoff relies upon its factual allegations presented above and asserts that fraud bars the termination of the 1992 Distribution Agreement.

As the district court noted, appellees point out that the 1992 Distribution Agreement contains an integration clause that bars any attempt to modify the terms of the agreement by reference to pre-agreement discussions or negotiations -- that is, by prohibiting parol evidence. Dayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 9 (W.D. Pa. July 10, 1995). Dayhoff responds that the parol evidence rule does not apply because Heinz Dolciaria fraudulently obtained the inclusion of the termination provision. Br. at 34.

The district court correctly found that Dayhoff's argument conflicts with two recent decisions of the Pennsylvania courts, which state's law the parties agree is controlling on this issue. In HCB Contractors v. Liberty Place Hotel Assoc., 652 A.2d 1278 (Pa. 1995), the appellant general contractor filed mechanics' liens against four buildings it had helped erect. Appellees, the building owners, successfully demurred to the claims on the ground that HCB in two separate provisions in the contract documents had agreed not to file such liens, instead limiting its potential recovery to the owners' interests. HCB argued on appeal that it had been induced fraudulently to sign the waiver of liens. The question on appeal was whether allegedly false oral representations could alter the express waiver of liens in the contract. The contract in question contained an integration clause.

The Supreme Court of Pennsylvania found that the parol evidence rule barred consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently omitted from the contract. Otherwise, the parol evidence rule "`would become a mockery,'" id. at 1279 (quoting Nicolella v. Palmer, 248 A.2d 20 (Pa. 1968)), and integrated contracts could be avoided or modified by claims of differing prior representations.

The second decision relied upon by the district court, 1726 Cherry St. Partnership v. Bell Atlantic Properties, Inc., 653 A.2d 663 (Pa. Super. Ct.), appeal denied, 664 A.2d 976 (Pa. 1995), addressed the same issue found in HCB and here. 1726

Cherry St. concerned Bell's acquisition of several parcels of land.  Appellants, the owners of one of the parcels, wanted theirs to be the last acquired, believing that this order of sale would bring them a better price than they otherwise would obtain.  They were persuaded to sell their land sooner by the inclusion of a so-called "most favored nation" clause in the contract which retroactively would adjust their price upward if Bell acquired certain other specified parcels at higher prices.  Id. at 664.

Bell later acquired and paid a higher price for land known as the CIGNA Parcel.  The parties had not named the CIGNA Parcel in the 1726 Cherry St. contract so Bell did not consider itself bound to raise the price paid to the 1726 Cherry St. owners.  The owners brought suit for fraud, reformation, or rescission, claiming that Bell orally had misrepresented its intention not to purchase the CIGNA Parcel; otherwise, they would have insisted on the inclusion of the CIGNA Parcel in the list of properties subject to most-favored-nation treatment.  The trial court applied the parol evidence rule in entering judgment for Bell.

The Superior Court affirmed, 1726 Cherry St., 653 A.2d at 670, explaining Pennsylvania's distinction between fraud in the execution and fraud in the inducement.  Fraud in the execution applies to situations where parties agree to include certain terms in an agreement, but such terms are not included.  Thus, the defrauded party is mistaken as to the contents of the physical document that it is signing.  Parol evidence is admissible in such a case only to show that certain provisions were supposed to be in the agreement but were omitted because of fraud, accident, or mistake.  Fraud in the inducement, on the other hand, does not involve terms omitted from an agreement, but rather allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement.  It is clear that Dayhoff alleges fraud in the inducement in this case, despite its protestations to the contrary.

In seeking to distinguish HCB and 1726 Cherry St., Dayhoff argues that the facts here differ, particularly in its claim that "an attorney said something that simply was not true, and moreover, this attorney stated that she was representing Dayhoff, another untruth."  Br. at 35-36.  However, we agree with the district court that the differing facts here do not affect the broad holdings of HCB or 1726 Cherry St. in any significant way.  Alternatively, Dayhoff again asserts, as it did in the district court, that the Supreme Court of Pennsylvania has not expressly rejected fraud in the inducement as an exception to the parol evidence rule.  Again agreeing with the district court, we find this argument meritless.  Accordingly, because the plain terms of section 14.3 cannot be altered by Dayhoff's factual claims of fraud in the inducement, even if Dayhoff's assertions are true, we agree with the holding of the district court that the termination provision of the 1992 Bulk Distribution Agreement is binding upon the parties.  Consequently, as the termination provision is absolutely clear and is applicable here, we will affirm the summary judgment granted against Dayhoff on its claims

that Heinz Italia improperly terminated the 1992 Bulk Candy Distribution Agreement.

Our result on this issue also leads us to affirm the district court's judgment dismissing Dayhoff's tortious interference with contract, constructive trust, civil conspiracy, and restitution claims predicated on the termination of the 1992 agreement. There is no doubt that the conditions for the termination of the 1992 agreement were met. Furthermore, Hershey did nothing wrong in requesting that the agreement be terminated. After all, it was acquiring Heinz Italia's candy business and it did not want Dayhoff as a candy distributor. There was no reason why it had to retain Dayhoff in that role, at least with respect to the 1992 agreement. Furthermore, we will not allow the claim for reformation to proceed either, as Dayhoff was well aware that section 14.3 was being included in the 1992 agreement.

Dayhoff claims, however, that appellees' fraud was not limited to the execution of the contract, but that there also was fraud when Dayhoff falsely was assured that the sale to Hershey would not affect its contracts. The district court rejected that claim as well when it granted appellees summary judgment. Dayhoff relies in part on the following allegations in making this second claim of fraud. Seletti and Volta constantly reassured Lele that there was no reason to terminate Dayhoff's contracts and that the sale of Heinz Italia's confectionery business would have no effect on those contracts. Dayhoff claims that, in fact, Volta told Lele that he should not worry. Dayhoff thus claims that appellees made fraudulent statements and that the district court improperly attempted to interpret and weigh the evidence concerning these allegations. Dayhoff asserts that numerous genuine issues of fact relate to the fraudulent conduct of appellees with regard to the termination of the Bulk Candy Distribution Agreement. Dayhoff claims that these issues of fact directly relate to Dayhoff's claims for imposition of a constructive trust and for damages for civil conspiracy, tortious interference, and restitution.

We partially agree with Dayhoff. Viewing the facts in the light most favorable to it as the non-moving party, we cannot say that there are no genuine issues of material fact that a jury should evaluate in this case. Thus, in this respect, unlike the district court, we are not satisfied that summary judgment should have been granted against Dayhoff on this particular claim related to the 1992 Bulk Distribution Agreement. Therefore, we will reverse the district court's grant of summary judgment to the limited extent that it precluded Dayhoff from proceeding with its fraud claim predicated on the allegations that it was defrauded when it was assured that the sale to Hershey would not affect its contracts with Heinz Dolciaria. However, we limit Dayhoff's possible recovery with respect to the 1992 agreement to damages, as that agreement, after all, was terminated lawfully. We otherwise will affirm the summary judgment entered on the 1992 agreement. At this time, we do not consider the effect of our reversal on claims relating to the 1989 and 1990 agreements, as the court dismissed those claims without considering them on

their merits.  To the extent that litigation regarding those agreements continues in the district court, the effect of the reversal may be considered on remand.

### C.  PERSONAL JURISDICTION OVER HEINZ ITALIA

Finally, Dayhoff disputes the district court's decision to dismiss all claims against Heinz Italia for lack of personal jurisdiction.  Dayhoff notes that the transaction that serves as the predicate for all of its claims in this litigation is the $133,000,000 sale of Heinz Italia's confectionery business (Heinz Dolciaria) to Hershey, with the advance approval and participation of H.J. Heinz in Pittsburgh.  Dayhoff claims that Heinz Italia directly participated in all aspects of this transaction, which participation it claims to be sufficient to confer specific jurisdiction over Heinz Italia under Pennsylvania's long-arm statute.

In deciding a motion to dismiss for lack of personal jurisdiction, we take the allegations of the complaint as true. Narco Avionics, Inc. v. Sportsman's Mkt., Inc., 792 F. Supp. 398, 402 (E.D. Pa. 1992).  But once a defendant has raised a jurisdictional defense, a plaintiff bears the burden of proving by affidavits or other competent evidence that jurisdiction is proper.  Id. (citing North Penn Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 689 (3d Cir.), cert. denied, 498 U.S. 847, 111 S.Ct. 133 (1990)); see also Mellon Bank (East) v. Diveronica Bros., 983 F.2d 551, 554 (3d Cir. 1993).

Under Fed. R. Civ. P. 4(e), we will apply Pennsylvania law to the jurisdictional issue.  Pennsylvania's long-arm statute authorizes the exercise of personal jurisdiction over nonresidents "to the fullest extent allowed under the Constitution of the United States . . . based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."  42 Pa. Cons. Stat. Ann.  5322(b) (1981). Section 5322(a) sets forth a variety of examples of sufficient contact, such as "[t]ransacting any business in this Commonwealth."  Id.  5322(a)(1) (Purdon's Supp. 1995).  Section 5322(b) further expands the potential bases for jurisdiction. When personal jurisdiction is based solely on minimum contacts under the long-arm statute, it is limited to "a cause of action or other matter arising from acts" which confer jurisdiction. Id.  5322(c).  As the district court noted, "[s]pecific jurisdiction arises when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum."  Dayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 13 (W.D. Pa. Oct. 3, 1994) (quoting Mellon Bank (East) PSFS, N.A. v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992)).  A plaintiff must demonstrate that a defendant purposefully has established "sufficient minimum contacts with the forum state that it `should reasonably anticipate being haled into court there.'"  Diveronica Bros., 983 F.2d at 554.

Dayhoff argues that Heinz Italia has had a wide range of contacts in Pennsylvania that would support the district court's exercise of jurisdiction over it.  The district court found, however, that even assuming that all of Dayhoff's

allegations are true, none of the contacts gave rise to or related, in any way, to this litigation. Dayhoff, Inc. v. H.J. Heinz Co., No. 93-1794, slip op. at 14 (W.D. Pa. Oct. 3, 1994). The court concluded that the contacts between Heinz Italia and Hershey regarding the sale of the confectionery business could not properly be considered in a determination of whether there was personal jurisdiction, because "the sale of the Heinz Italia confectionery business is not the subject of this litigation." Id. Moreover, the court found that Dayhoff had "provided no evidence which would indicate that any activities relating to the formation or breach of this agreement or the actions on the part of Dayhoff or Heinz Italia (who is not even a party to the Agreements) were directed toward this forum." Id. at 14-15.

We disagree with the conclusion of the district court. We conclude, instead, that the court took too narrow a view of the "subject of this litigation." In our view, this litigation is concerned intimately with Heinz Italia's sale of its confectionery business to Hershey in that Dayhoff alleges, apparently with good reason, that the sale itself precipitated the termination of its agreements. Furthermore, the agreements were performed in the United States, and Heinz Italia was the party who sent the letter of September 28, 1993, terminating them. Moreover, Dayhoff accuses Heinz Italia, inter alia, of tortious interference with contract, alleging that Heinz Italia interfered with its contracts with Heinz Dolciaria in order to sell that business to Hershey. It seems to us that these very claims against Heinz Italia are the "subject of this litigation," not merely the contracts between Dayhoff and Heinz Dolciaria. We see no need to discuss this point further because we think it clear that according to our view of the "subject of this litigation," Dayhoff has demonstrated that Heinz Italia has many contacts with Pennsylvania. Accordingly, we will reverse the order of the district court dismissing all claims against Heinz Italia for lack of personal jurisdiction.

IV. CONCLUSION

For the foregoing reasons, we will affirm the court's orders of October 3, 1994, and July 10, 1995, to the extent that those orders reflect the district court's conclusions that Dayhoff is bound by the arbitration and forum selection clauses of the 1989 and 1990 agreements with respect to its claims against Heinz Dolciaria and its successor, Sperlari s.r.l. We also will affirm the summary judgment against Dayhoff on its claims based upon the 1992 agreement, except on its claim of fraud with respect to the alleged assurance to it that the sale to Hershey would not affect its contracts with Heinz Dolciaria. However, we limit recovery for that fraud, if it is established, to damages. Otherwise, we will reverse the orders of October 3, 1994, and July 10, 1995, and will remand the case to the district court for further proceedings consistent with this opinion. In particular, the case may proceed against the appellees other than Heinz Dolciaria and Sperlari s.r.l. in the district court without regard for the arbitration and forum selection clauses of the 1989 and 1990 agreements, and the district court will exercise

jurisdiction over Heinz Italia.  The action may proceed for fraud claims related to the termination of the 1992 agreement to the limited extent we have described.  The parties will bear their own costs on this appeal.